No. 22,996.

MACK MILLER, *Appellee*, v. EMPIRE GAS & FUEL COMPANY, *Appellant.*

### SYLLABUS BY THE COURT.

1. COMPENSATION ACT—*Injuries—Release of Liability—Insufficient Evidence to Show Mutual Mistake or Fraud.* The evidence considered, and held insufficient to show mutual mistake of fact relating to an injured workman's physical condition at the time a release of his employer's liability was signed, and insufficient to show the release was procured by fraud.

2. SAME. Minor questions relating to the proceeding discussed.

Appeal from Allen district court; OSCAR FOUST, judge. Opinion filed December 11, 1920. Reversed.

*A. H. Campbell, Travis Morse,* both of Iola, *H. O. Caster, Hayes McCoy, S. N. Hawkes, C. C. Julien, Warren T. Spies,* and *Beryl R. Johnson,* all of Bartlesville, Okla., for the appellant.

*F. J. Oyler, W. H. Anderson,* and *J. M. Lamer,* all of Iola, for the appellee.

The opinion of the court was delivered by

BURCH, J.: The plaintiff recovered compensation for a personal injury, and the defendant appeals.

Miller v. Gas & Fuel Co.

The plaintiff suffered from habitual dislocation of his right shoulder. While digging a ditch for the defendant, a cave occurred, and in saving himself, the sixth dislocation was produced. The accident happened on August 30, 1918. On March 15, 1919, an operation on the shoulder was performed by Dr. W. P. Callahan, of Wichita, one of the defendant's surgeons. The operation consisted in sewing up lacerations in the stretched and toneless ligament surrounding the humerus, and in taking a tuck in the ligament. The operation was entirely successful, and precludes dislocation in the future. On May 5, 1919, the plaintiff executed and delivered to the defendant a release of liability, which was duly filed for record. The release was pleaded in bar of the action. The petition anticipated the plea and alleged the release was executed under a mutual mistake of fact with respect to the plaintiff's physical condition. The reply was a general denial. After the evidence had been introduced and the cause had been taken under advisement by the court, an amendment to the reply was allowed, which charged that the release was procured by fraudulent representations. The views of the court were expressed in a memorandum filed in connection with a form of journal entry signed by the court. A portion of the memorandum follows:

"Under the evidence introduced on the part of the plaintiff, including an exhibition by plaintiff of his injured arm and shoulder, upon the trial of the cause, it is clear the plaintiff, at the time he executed the alleged release, was mistaken in the belief that his injured arm and shoulder were cured, and that in a short time he would have normal use of same as before his alleged injury; and it is likewise clear the plaintiff was induced and led into this mistaken belief by the statements of the defendant's physician and surgeon made to him. The present condition of plaintiff's arm and shoulder shows clearly that plaintiff was mistaken; and it follows that the physicians and surgeons of the defendant who treated plaintiff for such injury, with the superior knowledge possessed by them, and with full knowledge of the nature and character of the injury sustained by plaintiff, were equally if not better prepared to say whether the injury was cured, and that the plaintiff would soon have normal use of his arm; and the making of such statements to plaintiff by defendant's physicians and surgeons must be attributed to one of two causes: first, that they were honestly mistaken in their statements to plaintiff that the arm was cured of the injury and that the plaintiff would soon have normal use of same; or second, that said physicians and surgeons, knowing the true condition of plaintiff's arm, falsely and fraudulently made such representations and statements to plaintiff."

The memorandum covers twelve pages of the printed abstract, and the quoted matter is all that may be found relating to the evidence, except some references, not now material, made in connection with the subject of the amount of compensation. This court is unable to discover any substantial evidence in the abstract that the defendant acted under any mistake of fact, or was guilty of any misrepresentation.

According to the memorandum, the district court's judgment is rested on statements of the defendant's surgeon that the plaintiff was cured, and would soon have normal use of his arm. The plaintiff testified, in response to leading questions, that the doctor told him he would be all right, he was all right, he would get all right, and would have full use of his arm. The plaintiff also testified as follows:

"The doctor said I would be all right now, says 'you are as much as you possibly can' . . .

"He said it would be all the way from four to five and six months; said it varied, what he had done to me; and then said, 'sometimes,' he says, 'you might not be entirely normal, of course, for a year.'"

The testimony may be accepted as the plaintiff's way of telling, truthfully enough, part of what the doctor said; but it does not represent in any fair sense what the doctor did say, or the state of his mind.

In October, 1918, the plaintiff was referred by the defendant's claim adjuster to Dr. F. L. Preston, a physician of El Dorado. The doctor examined the plaintiff and took X-ray pictures of his shoulder, and found nothing wrong with it. There was no evidence of adhesions. The doctor believed the plaintiff's arm was weak from lack of use, and advised the plaintiff to use his arm. The plaintiff corroborated this testimony. He said the doctor told him he had sore muscles, which would be cured by "going to work on the arm," but the plaintiff said it was painful to move his arm. In February, 1919, Doctor Preston again examined the plaintiff, and found him in the same condition as before. The doctor said the plaintiff would now be able to perform manual labor, as he did before the last dislocation, if he had followed instructions.

When the plaintiff was sent to Doctor Callahan, there was no special atrophy of the muscles. X-ray pictures disclosed a clear bone outline, without elision or roughness or thickness or

callousness, and the joint was normal except that the humerus hung lower than it should. This condition was remediable by the operation which was performed. After any operation involving joint ligaments, movement of the member must be kept up, systematically and persistently, or adhesions may form and stiffness will ensue. Doctor Callahan so testified, the plaintiff's experts, Doctors Fulton and Leavell, so testified, and there was no dispute about the matter. In such cases the patient is instructed to move the member to the place where it hurts, the next day to move it a little farther, and to continue doing this until normality is attained. This course of treatment, which is indispensable to a cure, was explained to the plaintiff time and again. The plaintiff testified as follows:

"When they released me from the hospital they told me I would be all right, and to use my arm as much as I possibly could, and I told them I would. . . . Doctor Callahan told me as soon as my arm commenced getting better to keep moving it."

Doctor Callahan testified as follows:

"At that time I advised him to use his arm. The reason for doing that is so the arm will not become stiff. I had a great deal of trouble getting him to do that; always became afraid; if I went to take hold of it myself, he would absolutely clinch and hold it, and keep insisting I would throw his arm out of place, because he found out if he moved his arm at a particular time, his arm would come out of place. I had trouble to get him to move his arm; told him and told Mr. Fields to put the boy back, to give him light work to do; if he kept on doing like he had, he would have a stiff arm, because he would not follow instructions. I examined him some time later, after he had gone home, and gave him the same advice again, to use his arm; and that's the last I saw of him."

Doctor Callahan further testified that while the plaintiff was in the hospital he would refuse to follow directions, and that if instructions had been followed, the plaintiff would now have a normal arm. The plaintiff admitted he was told to exercise his arm, before Doctor Callahan gave his testimony. In the same connection the plaintiff said he followed instructions "as best he could until his arm hurt." After Doctor Callahan testified, the plaintiff was recalled to testify in chief, and was called in rebuttal; but he had nothing further to say on the subject, and his counsel in open court disclaimed any purpose to discredit Doctor Callahan.

In June, 1919, the plaintiff made application to the welfare association of the city of El Dorado to be sent to the Rosedale

hospital for treatment of his shoulder. The association is an organization directing the charities of the city. Dr. F. A. Garvin, county health officer, was called to examine the plaintiff, and did so. He could find practically nothing wrong with the plaintiff's shoulder, and declined to recommend sending the plaintiff to the hospital. He told the plaintiff to exercise and use his arm. At the trial the plaintiff exhibited his arm and shoulder, and the muscles of the arm, shoulder and chest were all atrophied from disuse. When Doctor Preston undertook to examine him in presence of the court, he would pull his hand away before his shoulder could be manipulated, and he held his arm in a position which indicated he was afraid his shoulder might be dislocated. Doctor Fulton said the plaintiff had nearly normal forward use of his arm, and could nearly touch his left shoulder, but use of his arm outward and upward was about half normal. Doctor Leavell said the plaintiff had good forward movement of his arm, and about thirty-five to forty per cent backward movement, but had little upward movement. The limitations were the result of adhesions in the top chest cavity under the shoulder blade. Doctor Fulton said the adhesions followed the operation. Doctor Leavell thought they were probably produced by both the injury and the operation. Doctor Fulton said the operation was a fortunate thing for the plaintiff, and he would never have another dislocation. Both Doctor Fulton and Doctor Leavell said use of the plaintiff's arm could still be improved by persuasive movements.

It was within the province of the district court, if duly convinced, to discount all the rest of the evidence on the subject, and conclude from Doctor Leavell's testimony that the adhesions resulted in part from the injury. If that were the fact, the evidence is conclusive the adhesions were inconsequential. Doctor Leavell said that any adhesions which resulted from the injury would appear immediately, and could be detected by moving the arm. No adhesions were detected by the doctors who examined the plaintiff before the operation, the plaintiff made no suggestion to anybody that inhibition of movement existed before the operation, he did not testify that such was the fact, and he made no complaint of anything except pain in his arm. It was within the province of the district court, if duly convinced, to discount undisputed evidence relating to the

Miller v. Gas & Fuel Co.

plaintiff's lack of courage resolutely to obey instructions at the cost of daily pain; to discount the story with reference to the extent to which the arm actually had been exercised and used, plainly told by atrophy of the muscles; and to accept the plaintiff's statement—all there is in the record on the subject—that he followed instructions as best he could until his arm hurt. It was not within the province of the court, however, to find, without qualification, that Doctor Callahan stated to the plaintiff his arm was cured and he would soon have normal use of it. Effectiveness of the operation as a cure depended entirely on the use the plaintiff made of his arm after he left the hospital. The doctor, as a scientific man, not only knew that, but he did his best to make the plaintiff understand it. If the arm were moved farther and farther every day, adhesions could not form to bind it down, and stiffness would be prevented. Whether the plaintiff neglected to follow instructions, or felt unable to do so because movement hurt him, the cure depended on the movements; and Doctor Callahan was neither mistaken, nor guilty of false and fraudulent conduct.

The district court did not abuse its discretion in allowing the reply to be amended. While the release purported to be given by way of compromise, payment of compensation was included in the compromise, the release was considered by the parties as given under the workmen's compensation act, and the court was authorized to regard it as so given. If the plaintiff had been discharged from the hospital with the assurance that he was cured and would soon have normal use of his arm, this court would regard the doctor's statement to that effect as one of fact. (*Weathers v. Bridge Co.*, 99 Kan. 632, 162 Pac. 957; *Smith v. Kansas City*, 102 Kan. 518, 171 Pac. 9; *Wolf v. Packing Co.*, 105 Kan. 317, 182 Pac. 395.) The differences between mistake of fact and fraud are such that, in justice to litigants, a trial court should distinguish between them in returning findings of fact.

The judgment of the district court is reversed, and the cause is remanded for a new trial.