No. 26,433.

CLAUDE TUCKER, *Appellee*, v. THE ATCHISON, TOPEKA & SANTA FE
RAILWAY COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

RELEASE—*Validity—Mutual Mistake—Mistake as to Opinion*. A railroad em-
ployee was injured while engaged in removing the wheels and a. broken
truck from under a car. He received treatment from the railroad com-
pany's physicians and within a month executed a release for $75. He con-
tinued to receive treatment from the company's doctors and at the end of
four months executed another release for an additional amount of $275.
In an action to set aside the second release on the ground of mutual mis-
take, *held*, that to justify rescinding a contract or release on the ground
of mutual mistake, such mistake must be as to a past or present fact ma-
terial to the contract and not a mere mistake in prophecy, opinion, or in
belief relative to an uncertain event, such as probable developments from
and permanency of a known injury.

Appeal from Sedgwick district court, division No. 1; THOMAS E. ELCOCK,
judge. Opinion filed February 6, 1926. Reversed.

*William R. Smith, Owen J. Wood, Alfred A. Scott* and *Alfred G. Armstrong*,
all of Topeka, for the appellant.

*J. T. Rogers* and *E. P. Villepigue*, both of Wichita, for the appellee.

The opinion of the court was delivered by

HOPKINS, J.: The action was one for damages for personal in-
juries. The plaintiff, while employed by defendant as a laborer in
its yards at Wichita, was injured December 29, 1922. On January
16, 1923, he executed a release for $75. On April 30 following,. he
executed a further release on payment of $275. He afterwards
brought this action to set aside the release on the ground of mutual
mistake and for damages, recovered a verdict of $2,500, and entered
a remittitur of $350—the amount already received.

The defendant appeals, contending chiefly that plaintiff is bound
by the release.

The facts were substantially as follows: An interstate train en-
tered the yards for the purpose of having a defective truck under
one of the cars removed and replaced with a new one. The plain-
tiff was directed by his foreman to assist in bringing a set of wheels
and axle from the storage track to the repair track. It was neces-

Release, 34 Cyc. p. 1058 n. 2; 11 L. R. A. n. s. 201; 48 L. R. A. n. s. 449; L.
R. A. 1916B, 776; 23 R. C. L. 386.

Tucker v. Atchison, T. & S. F. Rly. Co.

sary to move them over wooden skids, one end resting on the storage track and the other on the repair track. The wheels and axle weighed approximately 2,000 pounds. The skids were of hard pine, about two and one-half inches thick, five inches wide, and about sixteen or eighteen feet long. Over these skids the wheels were to be pushed to the repair track and under the truck to be repaired. Plaintiff and two others were engaged in moving the wheels. While so doing one of the skids broke and the end flew up, striking him in the jaw, inflicting the injury of which complaint is made.

Touching his injuries, his consultations with physicians and the signing of the two releases, the plaintiff testified substantially as follows: That after the injuries the general foreman sent him to Doctor Horn. Doctor Horn looked at the cut on his face and said it was pretty bad, but with proper attention would be all right in a few days. The doctor felt of plaintiff's jaw, expressed the opinion that the bone was broken, and told him to go to the hospital at Mulvane. He did so, and saw Doctor Heath the next morning. Doctor Heath made an X-ray picture of his face and told him it showed no breaks; said he could go home, if he wanted to, and report back to Doctor Horn. His face was swollen and he had difficulty in speaking. He had bitten off the end of his tongue. There were five holes in it and a big gash in the middle. He returned home and reported to Doctor Horn the same afternoon. Upon being told that they had found no broken bones, Doctor Horn dressed the cut on plaintiff's face and told him to go home and report again the next morning. He was then told to consult Doctor Corrigan, and did so. Doctor Corrigan said the bone was broken in one place, if not in two or three; that every tooth would have to go sooner or later. He dressed the cut on plaintiff's face and told him to report back the next day. Plaintiff reported to him several days, and received an order to go to Topeka and have his teeth removed. He went to Topeka to the dentist's office in the morning and found the dentist out, was told he could see him about eleven or twelve o'clock, but decided not to wait, and returned to Wichita, where he remained until February 22. After returning to Wichita he saw Doctor Crittenden, who told him to keep hot applications on his face until the swelling went down and the jaw got strong enough, then he would have to go back to Topeka and have his teeth taken out. An abscess formed and plaintiff went to Mulvane for treatment. He remained there from February 22 until March 13, then went to

Topeka, had his lower teeth removed, and returned home. His principal disability at the time of the trial, March 6, 1925, was anchylosis, or limitation of motion of the lower jaw, difficulty in speaking intelligibly; also enlargement and tenderness of the jaw. This condition had existed ever since the injury. Plaintiff testified:

"The whole side of my face was paralyzed for a long time. It is yet, for that matter. For some month or six weeks, and even now, I can open my mouth only partially, nothing like I could before. That has always been so ever since the injury, never improved."

Whether or not his jaw was broken was never ascertained. Some of the doctors thought it was, others not. Plaintiff said he did not know which doctor was right. He did not know at the time he signed the release nor at the time of trial, from which it clearly appears he was not deceived; that he did not sign the release in the belief that his jaw was not broken. No new injuries had developed, nor had the result of the injuries already known been increased or augmented from the time of the second release, April 30, 1923, to the date of the trial, March 6, 1925. The second release reads:

"For and in full release, discharge and satisfaction of all claims, demands or causes of action arising from or growing out of any and all injuries sustained by me of every character and description, whether now apparent or which may hereafter develop," etc.

The plaintiff admitted that he had read this release and knew the contents thereof when he signed it. He apparently places upon Doctor Crittenden most of the responsibility for the belief that his injuries were only temporary. He testified:

"In my conversation with Doctor Crittenden he did not tell me how long it would be before I would be able to go back to my work. . . . He never did say exactly how long it would be, but he said all the time and every time I saw him he said it was no permanent injury. It would just be a small time and I would be over it. . . . The only thing to do was to keep hot applications on there and have the tooth (teeth) taken out, and in a couple of weeks I wouldn't know I was hurt. I asked him again in his office when I came back from Topeka, when he was treating the abscess. He said there was no danger; it would all be over in a few days; it just left me in a weakened condition; that I would soon be strong and able to work and never feel any effects afterwards."

This conversation appears to have occurred in February, after plaintiff's first trip to Topeka. The last release was executed two months thereafter, and necessarily, with the knowledge that his physical condition had not improved in accordance with the doctor's predictions.

It is difficult to construe the statements attributed to Doctor Crittenden as more than an expression of opinion. They were not statements of an existing fact, and when considered in connection with all the other circumstances, did not furnish sufficient basis upon which to set aside the contract on the ground of mutual mistake.

"If the defendant's physician knows that a release of damages by the plaintiff is being bargained for by both parties upon the basis of his opinion as to the nature and character of the injury and the probable duration of the resulting disability, it is his duty to give an honest opinion according to his best professional judgment, and his failure to do so will be ground for disregarding or cancelling the release, but . . . a release of damages in such cases should not be invalidated by the fact that it was induced by relying on the opinion of the physician as to the nature, extent, duration or probable consequences of the injury, which proves to have been entirely mistaken, where it was given in good faith, and was the physician's real and honest opinion, and was not given with any intention to influence the settlement of the claim. In other words, where one signs a release of his claim for damages in such a case on the assurance of the defendant's physician that his injuries are only temporary, he cannot avoid the release on the ground that the physician was mistaken, without also showing that his advice was given in bad faith." (Black on Rescission and Cancellation, § 390, p. 975.)

No contention is made that the opinion of Doctor Crittenden or the other doctors was given in bad faith, nor that it was for the purpose of inducing the plaintiff to make a settlement. If a mistake was made it was a mistake of prophecy, not of a past or existing fact. If the doctor made the statements attributed to him and if plaintiff believed them, still they were not statements of fact which would sustain a cause of action for rescission. Ordinarily it is only a mistake as to the existence of a past or present fact material to the contract which will warrant its rescission on the ground of mistake. The future duration of plaintiff's disability was a matter of conjecture, of opinion, of belief, and not of fact. The future duration and the ultimate effect of his injury were unknown and unknowable, a mistake concerning which was no more than a mistake of opinion or of belief, and not a mistake of fact. Four months had elapsed from the time of injury until plaintiff executed the release. In that time he had the advice and treatment of several physicians, none of whom he charges with bad faith. They undoubtedly gave him their best opinion on the extent and seriousness of his injury and the probable duration of his disability therefrom.

The plaintiff relies on *Parrott v. Railway Co.,* 111 Kan. 375, 207

Pac. 777; *Rider v. Railway Co.,* 112 Kan. 765, 217 Pac. 678; *Bidnick v. Armour & Co.,* 113 Kan. 277, 214 Pac. 808; *Koshka v. Railroad Co.,* 114 Kan. 126, 217 Pac. 293.

The principles enunciated in those cases are not applicable here.

In the Parrott case there was evidence of collaboration between the defendant's physician and its claim agent in obtaining the release; also evidence of lack of good faith, that the claim agent and the doctor purposely kept from the plaintiff the serious nature of his injury until the settlement was effected. The claim agent took the plaintiff to the doctor's office to make the settlement. It was held that there was not only mistake but misrepresentation, and the amount paid in settlement ($20) was inadequate.

In the Rider case the plaintiff, after being treated for a month by the defendant's physician, was discharged by him as cured, with instructions to report for duty in one day, and was directed by the physician to present the discharge to the claim agent of the railroad company, and arrange to go to work. Both plaintiff and the physician believed the injury was only temporary, and that the plaintiff was cured. Plaintiff signed a release, relying on these facts, and it afterwards developed that the injury was of a serious and permanent nature, preventing plaintiff from working for more than a year, and for the cure of which injury he finally underwent an operation.

In the Bidnick case, under the compensation law, the plaintiff sustained a hernia, and was treated and operated upon by the company's physician. Ten days after the operation he signed a release for $17.50. Two weeks after the operation he developed a "milk leg," which partially incapacitated him for a long period of time. It was held that the release was executed by mutual mistake and for a "grossly inadequate" consideration.

In the Koshka case, also for compensation, the plaintiff received an injury to his elbow and signed a release for $22. He testified that he did not know he was signing a release, but thought he was giving a receipt for wages. He did not know he was seriously injured. He depended upon what the defendant's doctor told him, that he was all right, and could go back to work. The defendant's claim agent also believed what the doctor said when he made the settlement for what was held to be a "grossly inadequate" consideration. In those cases but one settlement was made, and that soon after the injury. Here there were two settlements made, the second one four months after the injury. Here there was no coöperation,

Tucker v. Atchison, T. & S. F. Rly. Co.

collaboration or collusion betwen defendant's physician and claim agent. No doctor gave any opinion at the time of the second settlement, and the claim agent was not advised what any physician believed as to the plaintiff's condition. The amount paid the plaintiff was substantial ($350). Here no new injuries, or new effects of known injuries, had developed up to the time of the trial.

*Chicago & N. W. Ry. Co. v. Wilcox,* 116 Fed. 913 (C. C. A., 8th Circuit), was an action to set aside a release of a claim for personal injuries on the ground of fraud, undue influence and mistake. The plaintiff compromised and released a claim for a broken hip. She knew when she settled that her hip had been seriously broken. She was induced by the statement of her own physician, who was also the company's physician, to believe that she would be well within a year, and settled upon that basis. She was mistaken, and her injury and disability proved to be permanent. It was held that her mistake was not a mistake of fact, but a mistake in opinion or belief as to a future event, and that it furnished no basis for an avoidance of her release. It was said in the opinion:

"It is not every mistake that will lay the foundation for the rescission of an agreement. That foundation can be laid only by a mistake of a past or present fact material to the agreement. Such an effect cannot be produced by a mistake in prophecy or in opinion, or by a mistake in belief relative to an uncertain future event. A mistake as to the future unknowable effect of existing facts, a mistake as to the future uncertain duration of a known condition, or a mistake as to the future effect of a personal injury, cannot have this effect, because these future happenings are not facts, and in the nature of things are not capable of exact knowledge; and everyone who contracts in reliance upon opinions or beliefs concerning them knows that these opinions and beliefs are conjectural, and makes his agreement in view of the well-known fact that they may turn out to be mistaken, and assumes the chances that they will do so. Hence, where parties have knowingly and purposely made an agreement to compromise and settle a doubtful claim, whose character and extent are necessarily conditioned by future contingent events, it is no ground for the avoidance of the contract that the events happen very differently from the expectation, opinion or belief of one or both of the parties." (p. 914.)

In *Davis v. Higgins,* 95 Okla. 32, 217 Pac. 193, it was held that:

"A release may be set aside for mutual mistake; but in such case there must be mutual mistake of a past or present fact material to the agreement, and must not be a mistake in prophecy, opinion, or in belief relative to an uncertain event, such as probable developments from and permanency of a known injury." (Syl. ¶ 3.)

In *Richardson v. Chicago, M. & St. P. Ry. Co.*, 157 Minn. 474, it was said in the opinion:

"To justify rescinding a contract or release on the ground of mutual mistake, the mistake must be as to a 'past or present fact material to the contract.' That the injuries for which settlement was made resulted in disabilities and ailments which were not anticipated at the time it was made is not such a mistake. The consequences which will follow in the future from known injuries depend upon so many unknown conditions and contingencies and will vary to such an extent in different individuals that they cannot be known with any degree of certainty. Mistakes in forecasting such consequences are mistakes of opinion, not of fact, and furnish no sufficient ground for annulling the release." (p. 476. See, also, *Morris v. Seaboard Air-Line Ry.*, 23 Ga. App. 554; *Cogswell v. Boston & M. R. R.*, 78 N. H. 379; *Richardson v. Chicago, M. & St. P. Ry. Co.*, 157 Minn. 474; *Nielsen v. Portland Gas & Coke Co.*, 76 Ore. 505; *Kowalke v. Milwaukee Elec. Ry. & Lt. Co.*, 103 Wis. 472. Where fraud was alleged, see *Railway Co. v. Bennett*, 63 Kan. 781, 66 Pac. 1018.)

Other questions raised in the briefs need not be discussed.

The judgment is reversed and the cause remanded with directions to enter judgment for the defendant.