No. 26,732.

W. W. HARP, *Appellee*, v. THE RED STAR MILLING COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

WORKMEN'S COMPENSATION ACTS — *Contract Releasing Employer from Liability—Cancellation—Mutual Mistake of Fact*. The proceedings considered, and *held*, a contract between a workman and his employer, settling compensation for personal injury and releasing the employer from liability, was erroneously canceled as having been executed under a mutual mistake of fact.

Appeal from Sedgwick district court, division No. 4; A. MILLS EBRIGHT, judge. Opinion filed July 10, 1926. Reversed.

*W. D. Jochems* and *J. Wirth Sargent,* both of Wichita, for the appellant.
*J. T. Rogers* and *E. P. Villepigue,* both of Wichita, for the appellee.

Cancellation of Instruments, 9 C. J. p. 1257 n. 36. Release, 34 Cyc. p. 1058 n. 2. Workmen's Compensation Acts, C. J. p. 127 n. 95.

The opinion of the court was delivered by

BURCH, J.: The action was one by a workman to set aside a contract with his employer settling the workman's claim for personal injuries and releasing the employer from future liability respecting such injuries, and for compensation under the workmen's compensation act. Plaintiff recovered, and defendant appeals.

On February 12, 1924, plaintiff was engaged in loading a box car with bags of flour. The bags were placed in tiers, and plaintiff stood on lower tiers to build up higher ones. A tier on which he was standing fell, he was precipitated to the floor of the car, and in falling his left side struck a flour truck standing in the car. Plaintiff was taken immediately to a hospital. The company's physician, Doctor Crittenden, was present when he arrived, and treated him. Plaintiff complained of pains in his back and chest, and fracture of the eighth and ninth ribs and injury to the left kidney were suspected. An X-ray plate promptly taken disclosed that the ribs were not fractured. A little blood was passed with the urine for a day or two, and then disappeared. Thereafter, no abnormal condition of the kidney was discoverable, and on February 22 plaintiff was removed to his home. Responding to calls by plaintiff, Doctor Crittenden visited him on February 25, February 27, and March 3. On the occasion of the last visit, the doctor required plaintiff to walk about the room, and required plaintiff to visit him at his office, the purpose being to induce plaintiff to get about and use himself, in order to restore his functions. Plaintiff visited Doctor Crittenden at his office on March 7. The doctor made a thorough physical examination, which included an analysis of urine, and found plaintiff had practically recovered, so far as any damage to his tissues was concerned. Plaintiff, however, still complained of pain and shortness of breath, and Doctor Crittenden diagnosed his condition as neurotic, a traumatic neurotic condition. Doctor Crittenden did not see plaintiff again.

Plaintiff testified that while he was still under Doctor Crittenden's care, the doctor told him he was "not hurt very bad," was "getting along all right," and was "going to get all right." Plaintiff's wife testified the doctor also said her husband would be able to go back to work in a few days.

Plaintiff testified he did not like Doctor Crittenden, and became dissatisfied with him. After going home from the hospital, and

Harp v. Red Star Milling Co.

about the time of the doctor's last visit to his home on March 3, plaintiff learned Doctor Crittenden was the company's doctor, and plaintiff did not trust him any further. Plaintiff then consulted his own family physician, Doctor McComb. A day or two later plaintiff employed an attorney, Mr. R. G. Bennet.

On March 18, Bennet gave notice of injury, and offered to settle for $4,786.32. On March 24, Bennet made claim for compensation, and announced consent to arbitration, limiting the arbitration, however, to character and quality of disability, amount of compensation, and terms of payment. Bennet then negotiated a settlement with defendant, consummated by a contract of settlement and release executed on April 4.

When plaintiff consulted Doctor McComb, he told the doctor he had suffered a fracture of his ribs, and gave the doctor a complete detailed statement of his aches, pains, condition, and feelings. He complained of his back and side; when he got down he could hardly get up; he could not walk to do any good; he had no breath; he was like a wind-broken horse; he tired with the least exertion; and he could not sleep at night. Although he was in this condition, and had consulted Doctor McComb because he did not trust the company's physician, plaintiff failed to remember what Doctor McComb said about his injuries, told Doctor McComb nothing about his proceeding against the company, and did not consult Doctor McComb in reference to the settlement.

Doctor McComb testified that when plaintiff first came to him he received a full history of the case, examined the reflexes, the heart, the chest and the abdomen, and regarded the "larger portion" of plaintiff's injuries as "more or less" temporary, and considered he would "improve in time." The doctor's impression was that he so told plaintiff. The physical conditions which the doctor discovered were unsteadiness of gait, some difficulty in breathing, a rather sluggish heart action, retarded reflexes, and "symptoms" of pain on pressure in the lumbar region. Doctor McComb's diagnosis was, plaintiff was suffering from traumatic neurosis, something which depends "chiefly on the statement of the patient," and the outcome of which is doubtful. Doctor McComb testified as follows:

"Q. A neurotic condition is one which it is pretty hard to tell what the extent of it is going to be or how long it is going to last? A. That is true."

He testified further that he discussed plaintiff's injury with plaintiff, and thought plaintiff would eventually get back to work and be

normal. In the examination of cases a doctor can never be absolutely certain in his opinion, but he did not entertain the idea plaintiff's injuries would be permanent.

Plaintiff testified that at the time he signed the contract of settlement and release he believed Mr. Bennet said "the doctors" told him plaintiff would be all right in a short time and able to go to work. Bennet had consulted Doctor McComb, and nobody else. Bennet took Doctor McComb's opinion with respect to the extent of plaintiff's injuries, and in making the settlement relied on what Doctor McComb and plaintiff told him.

Plaintiff settled with defendant for a total sum of $221.08 and payment of medical expenses. Plaintiff had received $46.08 previous to the settlement, and the final payment was $175. The settlement covered the loss or damage resulting or to result on account of the accident and injuries. The contract contained the following stipulations:

"I further state that I am aware and have known the full extent of my past and present injuries, and I am also aware of the fact that I may be subject to other disabilities as a result of the accident and injuries aforesaid, . . . but I have agreed and do hereby agree to accept the above sum . . . in full satisfaction for the above injuries and any resulting injuries I may have or hereafter suffer as a result of the accident aforesaid.

"I further state that . . . I rely on no statements whatever in making this release, and especially state that I do not rely on any statement made to me by any physician or surgeon of my employer or any other person connected with my employer, concerning my condition. . . ."

Bennet discussed the settlement with plaintiff, read the contract to him before he signed it, and plaintiff fully understood it. Sixteen days after the settlement, plaintiff changed lawyers, as he had changed doctors, and commenced this action to set aside the contract and to recover for permanent disability. After telling of the accident, the petition alleged defendant sent plaintiff to Doctor Crittenden, an employee of defendant, for the examination and treatment, and continued as follows:

"Doctor Crittenden immediately began to attend upon this plaintiff, and informed and stated to the plaintiff that in such fall he had three ribs fractured on the left side and that the muscles had been bruised to some extent. Plaintiff further states that the said Doctor Crittenden informed him at the time of his injury and immediately before the time he signed the release heretofore mentioned, that his injuries were temporary and that he was not hurt to any extent, that he was then physically able to resume his duties with said company or to secure other employment, and that such injuries were

Harp v. Red Star Milling Co.

not permanent, and believing that the said Doctor Crittenden was correct in his statements at such time, this plaintiff accepted the said sum of $175 and signed the release heretofore mentioned, a copy of said release being hereto attached, marked Exhibit 'A,' and especially pleaded and made a part hereof as fully and completely in all respects as if set out herein at length.

.    .    .    .    .    .    .    .    .    .    .    .    .    .    .

"Plaintiff now charges that his injuries are permanent, and that their nature and extent were not understood or known by the plaintiff or by the defendant or its physician at the time of the execution of the release, in this, that each of the said parties believed such injuries to be temporary and of slight consequence, when as a matter of fact the said injuries are of serious consequence and of a permanent nature."

The contract thus made a part of the petition disclosed that plaintiff received $175 on his agreement, that he knew the facts relating to his condition, did not rely on any statement by Doctor Crittenden concerning his condition, and was aware that he might be subject to future disability. The subject of mistake with respect to extent and duration of disability was definitely covered, and such a contract may not be treated as a scrap of paper. When made between competent parties, for fair consideration, it is as binding as any other kind of contract, unless tainted by fraud, or such overreaching or other unconscionable conduct as amounts to fraud. The petition was false in that Doctor Crittenden did not see plaintiff after March 7, and made no statement to plaintiff regarding his condition immediately before the release was signed. The allegations of the petition were disproved by plaintiff's own positive testimony that after he learned Doctor Crittenden was the company's doctor he did not trust him any further, and consulted his own physician, Doctor McComb. The testimony disclosed there was no mistake of fact with respect to plaintiff's condition. Doctor Crittenden said that when he last saw plaintiff, on March 7, his condition was a traumatic neurotic condition. Doctor McComb said that plaintiff's condition when plaintiff first came to him, and plaintiff's condition at the time of the trial, was substantially the same, and his trouble was traumatic neurosis. The court found plaintiff was suffering from traumatic neurosis, and during the sixty-seven days which elapsed between accident and settlement, the outcome of plaintiff's neurosis could not be definitely foretold.

When the contract of settlement was signed, both doctors agreed in prognosis. Neither one entertained the idea that plaintiff's injury would be permanent. According to plaintiff's evidence, the

statements of Doctor Crittenden relating to his condition were the following: That he was not hurt "very bad"—an indefinite expression of opinion regarding seriousness, and not a description of a physical condition; that he was "going to get all right"—a prophecy; that he "would be all right," and would be "able to go back to work in a few days"—a further prophecy. Doctor Crittenden did not pronounce plaintiff cured, as in *Miller v. Gas & Fuel Co.*, 108 Kan. 124, 193 Pac. 896, or say that he had recovered, as in *Crawn v. Packing Co.*, 111 Kan. 573, 207 Pac. 793, or direct him to go to work as .cured, as in *Rider v. Railway Co.*, 112 Kan. 765, 212 Pac. 678; and if plaintiff had relied on the doctor's statements, they would have afforded no ground for setting aside the release:

"To justify rescinding a contract or release on the ground of mutual mistake, such mistake must be as to a past or present fact material to the contract and not a mere mistake in prophecy, opinion, or in belief relative to an uncertain event, such as probable developments from and permanency of a known injury." (*Tucker v. Atchison, T. & S. F. Rly. Co.*, 120 Kan. 244, syl., 246 Pac. 269.)

Plaintiff undertakes to distinguish the Tucker case on the ground the accident was one for damages, and not, as in this instance, one for compensation. In each case plaintiff was obliged to get rid of a release before he could proceed. Cancellation is a remedy characteristically conditioned and constant for all cases, whatever the nature of consequential proceedings may be.

Plaintiff renounced his doctor, his lawyer, and his contract of settlement, and as might be expected, renounced his petition. He testified he was told, either by a company doctor or by a man representing the company, that he "had completely recovered, or practically. so, and would get along all right, and could go to work in a short time." Neither the doctor nor the man was identified. Plaintiff also testified that, at the time he settled, "the doctors" examined him, and said he was "getting along all right," and he had no reason to believe otherwise.

When negotiations for settlement were opened, the company requested plaintiff to report to Doctors Edgerton and Hoffman for examination. He did so, and on March 31, five days before the contract was signed, they gave him a thorough examination. They were unable to detect anything abnormal in plaintiff's physical condition, for one of his age. In this connection it may be stated that Doctors Edgerton and Hoffman examined plaintiff a year later,

just before the trial. In this examination they exhausted all the methods, instrumentalities and tests employed by physicians in such work. They also had a complete history of the injury and subsequent treatment. The result was the same as the result of the first examination—no physical finding to show plaintiff ever had an injury. That plaintiff suffered from subjective symptoms—pain in region of lower chest, over lower ribs, and low down in the back, difficulty in breathing, and shortness of breath—was not disputed, but, assuming plaintiff had those symptoms, they were due to neurosis, a term loosely employed to explain conditions for which no physical cause is discoverable by use of the hands, eyes and ears, and the instrumentalities employed to magnify and multiply efficiency of those organs. There was no evidence that Doctors Edgerton and Hoffman had any authority to advise plaintiff respecting his condition. They were employed to examine plaintiff and report to the company. What they reported to the company is not disclosed. What plaintiff said they said did not extend beyond expression of opinion, and he contracted that he did not rely on what they said. In any event, he was not privileged to shift the foundation of his lawsuit from Doctor Crittenden's statements to statements of Doctors Edgerton and Hoffman, or statements of some unidentified person.

Plaintiff's wife gave some testimony in his behalf. She said Doctor Crittenden told her that her husband had some fractured ribs, a bruised liver and a mashed kidney, and was passing blood, but he was not hurt very bad, would be all right, and would be able to go back to work in a few days, and she did not think her husband was badly hurt, because Doctor Crittenden told her he was not. Evidently the term "badly hurt" is far from being positive or absolute. She also testified that Doctor McComb gave her "his opinion" that her husband was not seriously hurt, and "would soon be all right, and well again as he ever was." Comment on this testimony is unnecessary.

The judgment of the district court is reversed, and the cause is remanded with direction to sustain the demurrer to the plaintiff's evidence.